04-60996
CIV-COHN

AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District *Southern* |
|---|---|

MAGISTRATE JUDGE
WHITE

| Name *DARRYL HARDEN* | Prisoner No. *#673792* | Case No. *94-1624-CIV-UNGARO* |
|---|---|---|

BENAGES

Place of Confinement *FLORIDA DEPT. OF CORRECTIONS*
*MARTIN CORR. INST., 1150 SW Allapattah Rd*
*Indiantown, FL. 34956*

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| *DARRYL HARDEN* | v. *JAMES CROSBY JR.* |

The Attorney General of the State of: *CHARLES CRIST, Tallahassee, FL.*

## PETITION

1. Name and location of court which entered the judgment of conviction under attack *17th judicial Circuit Court, Broward Co., Ft. Lauderdale, FL.*

2. Date of judgment of conviction *November 15 1990*

3. Length of sentence *Life (F.S.P.), (w/ Mandatory 25 yrs.)*

4. Nature of offense involved (all counts) *1st degree felony murder*

_____

_____

_____

5. What was your plea? (Check one)
   (a) Not guilty ☑
   (b) Guilty ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

   _____

   _____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury ☑
   (b) Judge only ☐

7. Did you testify at the trial?
   Yes ☑ No ☐

8. Did you appeal from the judgment of conviction?
   Yes ☑ No ☐

cat / div. *Broward*
Case # *0.04 CV 60996*
Judge *JIC*  Mag *PAW*
Main file _____ _____
Receipt # _____

AO 241 (Rev. 5/85)

9. If you did appeal, answer the following:

(a) Name of court *Fourth D.C.A., W. Palm Bch, FL.*

(b) Result *Per Curiam Affirmed*

(c) Date of result and citation, if known *4/29/92, 600 So2d 1123 (4 DCA 1992)*

(d) Grounds raised *1. Trial court erred in denying motion to Suppress confession. 2., evidence of a witness' state of mind.*

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

    (1) Name of court *N/A*

    (2) Result *N/A*

    (3) Date of result and citation, if known *N/A*

    (4) Grounds raised

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

    (1) Name of court *N/A*

    (2) Result *N/A*

    (3) Date of result and citation, if known *N/A*

    (4) Grounds raised *N/A*

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any court, state or federal?
Yes ☑ No ☐

11. If your answer to 10 was "yes," give the following information:

    (a) (1) Name of court *17th judicial Circuit, Aug. 17 1992*

        (2) Nature of proceeding *3.850, post-conviction relief*

        (3) Grounds raised *7 grounds, #6 and 7 were ineffective counsel claims involving failure to investigate and →*

(3)

AO 241 (Rev. 5/85)

*Present mental incompetency defense, as related to confession, and failure to investigate and present case relating to burglary, (felony murder).*

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No ☑

(5) Result *Denied, "with exception of trial counsel claims"*

(6) Date of result *September 10 1992*

(b) As to any second petition, application or motion give the same information:

(1) Name of court *19 judicial Circuit, Martin Co. FLA*

(2) Nature of proceeding *State Habeas Corpus, case #*

(3) Grounds raised *Petitioner validly should have been found guilty of 2nd degree murder of his wife. Petitioner denied rights under Miranda v. Arizona, and being Sun v. U.S., as to the confession.*

(4) Did you receive an evidentiary hearing on your petition, application or motion?
Yes ☐   No ☑

(5) Result *Denied*

(6) Date of result *DECEMBER 10, 2003*

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.       Yes ☑   No ☐
(2) Second petition, etc.    Yes ☑   No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:
*N/A, but see page 4(a) ⟶*

12. State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

## BACKGROUND OF CASE

1.) The petitioner filed the original Federal petition in the Southern District, August 5, 1994. On January 4 1995, U.S. Magistrate Judge Sorrentino issued a report and recommendation, that the petition be dismissed, "without pre-judice", to return to State court to exhaust ineffective appellate counsel issues as the Federal petition was Mixed.[NT 1.]

2.) On January 30 1995, Judge Ungaro-Benages upheld the recommendation. (See docket Exh."A")
    The petitioner has exhausted all remedies with the highest State court of Competent jurisdiction.

3.) This is a capital case, (pre-A.E.D.P.A.), where a Federal petition has been properly filed and pending without adjudication on the Merits of properly exhausted claims.

---

NT. 1. page 6 of the report found that claims one and two of direct appeal, and ineffective trial counsel claims of 3.850, were properly exhausted.

4.)  The petitioner maintains Actual innocence to both first degree pre meditated murder, and burglary of the residence of his wife's family, where she resided during separation, where he was an invitee many times by family throughout the marriage and, by his wife during separation as they still saw each other and communicated by phone heading towards reconciliation.

5.)  The petitioner maintains that the combination of heat of passion, sudden provocation, and a defense from his wifes initiation of the fight that day led to the untimely and unplanned death of his wife whom he loved very much, and that his attorney failed to adequately present this at trial.

(see Memorandum of law for brief on applicable case law relied upon)

-4(b)-

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: *State courts erred, in denial of Motion to Suppress confession.*

Supporting FACTS (state *briefly* without citing cases or law) *The petitioner relies on the appellate brief as attached in Appendix, Exh "B", Ground one.*

B. Ground two: *State courts erred in denial of ineffective trial counsel claims from a Rule 3.850 Motion.*

Supporting FACTS (state *briefly* without citing cases or law): *These claims are derived from the facts of the case within the Appellate brief, and grounds 6 and 7 of the original habeas petition, attached in Appendix as Exh. "C".*

AO 241 (Rev. 5/85)

C. Ground three: _State Courts erred in admitting irrelevant evidence of a witness' state of mind._

Supporting FACTS (state *briefly* without citing cases or law): _The petitioner relies on the appellate brief as attached in appendix, Exh "B", ground two._

D. Ground four _____

Supporting FACTS (state *briefly* without citing cases or law): _____

N/A

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐  No ☑

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing _____

(b) At arraignment and plea _____

AO 241 (Rev. 5/85)

(c) At trial  *Johnny McCray, E. Atlantic Blvd. 400*
*Pompano Bch, FL. 33060*

(d) At sentencing _____

*(Same as above)*

(e) On appeal  *Mallorye Cunningham, 301 N Olive Ave*
*9th floor, W Palm Bch FL, 33401*

(f) In any post-conviction proceeding _____

*Pro Se*

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

*Pro Se*

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No ✓

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ✓
(a) If so, give name and location of court which imposed sentence to be served in the future: _____

(b) Give date and length of the above sentence:_____ *N/A*

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ✓ No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

*July 23, 2004*
(date)

*Darryl Harden*
Signature of Petitioner

(7)

IN THE U.S. DISTRICT COURT, SOUTHERN
DISTRICT OF FLORIDA

DARRY HARDEN
     Petitioner,

V/s

JAMES CROSBY JR.
  FLA. Dept. of Corrections,
          Respondent,                    /

Case No.
94-1624-CIV-UNGARO-
            BENAGES


MEMORANDUM OF LAW,
28 U.S.C. 2254


DARRYL HARDEN, Pro.Se
# 673792
MARTIN CORR. INST.
1150 S.W. Allapattah Rd.
Indiantown, FL. 34956

This Federal proceeding is "pending" under Lindh v. Murphy 321 U.S. 320 (1997), see Woodford V Garceau 16 Fla L. Wkly Fed. (S-170 3.25/03). Under the Standard in Williams V. Taylor 120 S.Ct 1495 (2000), the state court decisions resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in State court, 28 U.S.C. 2254(d).

The Eleventh Circut has held that the consideration of habeas petitions "[Should] Survey the legal landscape, at the time, the state court adjudicated the petitioners claim to determine the applicable Supreme Court authority; the law is clearly established if Supreme Ct precedent would have compelled a particular result in the case."
Neelley v. Nagle 138 F.3d 917 (11th C.A 1998).

A defendant is entitled to habeas relief, "when an error results in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict."
Ross v. U.S. 289 F.3d 677 (11th C.A. 2002)

1.

## Actual Innocence

Murray v. Carrier 477 U.S. 478, 496 (1986):
the safeguard against miscarriages of justice
...is the right to effective assistance
of counsel...which may in a particular
case be violated by even an isolated
error of counsel, if that error is egregious
and prejudicial.

Code v. Montgomery 799 F.2d 1487 (11th C.A. 1986),
for inadequate pretrial preparation, investigation
and failure to request a continuance.

Herrera v. Collins 506 U.S. 390, 400 (1993)
"In a capital case, a truly persuasive
demonstration of actual innocence made
after trial, would warrant Federal
Habeas relief if there was no State
avenue open."

Schlup v. Delo 513 U.S. 298 (1995).
The gateway mechanism for substantive
and procedural actual innocence Claims. —
It is more likely than not that no
reasonable juror would have found Darryl Harden
guilty of 1st degree pre-med murder and burglary
beyond a reasonable doubt under a sufficient
manslaughter defense.

2.

WHEREFORE, the decisions of state court are contrary to the decisions of the foregoing U.S. Supreme Court decisions, and where the issue's are debateable amongst jurists of reason, the cause deserves encouragement to proceed further. Barefoot v. Estelle 103 S.Ct. 3394 (1983).

The undersigned prays that this court grants relief to which he is entitled, executed this 23 day of July 2004.

/S/ Darryl Harden

DARRL HARDEN ProSe
#673792
MARTIN CORR. INST.
1150 S.W. Allapattah Rd.
Indiantown, FL. 34956

5.

E X H I B I T   "A"

CRS     CLOSED

U.S. District Court
FLS - Southern District of Florida (Miami)

CIVIL DOCKET FOR CASE #: 94-CV-1624

Harden v. Dept. of Corrections                    Filed: 08/05/94
Assigned to: Ursula Ungaro-Benages
Demand: $0                          Nature of Suit: 550
Lead Docket: None                   Jurisdiction: Federal Question
Dkt # in other court: None

Cause: 42:1983 State Prisoner Civil Rights


DARRYL HARDEN                       Darryl Harden
                                    [COR LD NTC]
                                    Hendry Correctional Institution
                                    Route 2 Box 13-A
                                    Immokalee, FL  33934-9747

     v.

FLORIDA DEPARTMENT OF              Melynda Layne Melear
CORRECTIONS, Harry K.              [COR LD NTC]
Singletary, Secretary             Florida Attorney General's Office
                                   1655 Palm Beach Lakes Boulevard
                                   3rd Floor
                                   West Palm Beach, FL  33401-2299
                                   561-688-7759


Docket as of January 5, 1999 1:40 pm                    Page 1

Proceedings include all events.                                    CHS
1:94CV1624      Harden v. Dept. of Corrections             CLOSED


-------------------------------------

08/05/94   1        COMPLAINT filed; B-3 CHS (sk) [Entry date 08/08/94]

08/05/94   2        Clerk's Notice referring case to  Magistrate Judge
                    Sorrentino, re: Administrative Order 89-31 (sk)
                    [Entry date 08/08/94]

08/05/94   3        MOTION by Darryl Harden |to proceed in forma pauperis| (sk)
                    [Entry date 08/08/94]

08/09/94   4        ORDER TO SHOW CAUSE:  granting [3-1] motion to proceed in
                    forma pauperis | RESPONSE to Show Cause Order for 9/12/94|
                    ( signed by Magistrate Judge Charlene H. Sorrentino  on
                    8/8/94) CCAP (cp) [Entry date 08/15/94]

09/08/94   5        RESPONSE to Order to Show Cause by Dept. of Corrections
                    (Attorney Melynda Layne Melear) (cp) [Entry date 09/14/94]

09/08/94   6        EXHIBITS to: [5-1] response by Dept. of Corrections (cp)
                    [Entry date 09/14/94]

10/15/94   7        MOTION by Darryl Harden |to extend time to answer
                    respondent's response to Order to show cause| (cp)
                    [Entry date 10/18/94]

10/15/94  ---       Motion(s) referred: [7-1] motion to extend time to answer
                    respondent's response to Order to show cause referred  to
                    Magistrate Judge Charlene H. Sorrentino (cp)
                    [Entry date 10/18/94]

10/21/94   8        ORDER  granting [7-1] motion to extend time to answer
                    respondent's response to Order to show cause, | Memo of Law
                    due for 10/20/94| ( signed by Magistrate Judge Charlene H.
                    Sorrentino  on 10/19/94) CCAP (cp) [Entry date 10/24/94]

11/07/94   9        MOTION by Darryl Harden |to accept out of time response | (cp
                    [Entry date 11/14/94]

11/07/94   10       REPLY by Darryl Harden to [5-1] response (cp) [Entry date 11/

01/04/95   11       REPORT AND RECOMMENDATIONS  of Magistrate Judge Charlene H.
                    Sorrentino That petition be dismissed without prejudice, to
                    allow petitioner to return to state court to exhaust his
                    state remedies. Signed on: 1/4/95 . Case no longer referred

Docket as of January 5, 1999 1:40 pm                        Page 2

```
Proceedings include all events.                                    CHS
1:94CV1624      Harden v. Dept. of Corrections          CLOSED
```

```
                    to Objections to R and R due by 1/14/95  CCAP (cp)
                    [Entry date 01/09/95]

01/04/95 ---        CASE AND MOTIONS NO LONGER REFERRED TO Magistrate [9-1]
                    motion to accept out of time response, [7-1] motion to
                    extend time to answer respondent's response to Order to
                    show cause, [3-1] motion to proceed in forma pauperis (cp)
                    [Entry date 01/09/95]

01/04/95  12        ORDER granting, nunc pro tunc, [9-1] motion to accept out
                    of time response ( signed by Magistrate Judge Charlene H.
                    Sorrentino on 1/4/95) CCAP (cp) [Entry date 01/09/95]

02/01/95  13        ORDER of dismissal for lack of exhaustion of State habeas
                    corpus, without prejudice. ( signed by Judge Ursula
                    Ungaro-Benages on 1/30/95) CCAP/M (cp)
                    [Entry date 02/06/95]

02/01/95 ---        Case closed (cp) [Entry date 02/06/95]
```

EXHIBIT   "B"



IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA

FOURTH DISTRICT

DARRYL HARDEN, )
)
    Appellant, )
)
vs. )    CASE NO. 91-0417
)
STATE OF FLORIDA, )
)
    Appellee. )
)
_____)

**RECEIVED**

NOV 0 1 1991

OFFICE OF
ATTORNEY GENERAL
WEST PALM BEACH, FLORIDA

<u>INITIAL BRIEF OF APPELLANT</u>

On Appeal from the Seventeenth Judicial
Circuit, In and For Broward County, Florida
(Criminal Division)

RICHARD L. JORANDBY
Public Defender

MALLORYE CUNNINGHAM
Assistant Public Defender
Florida Bar No. 0561680
15th Judicial Circuit of Florida
Governmental Center/9th Floor
301 North Olive Avenue
West Palm Beach, Florida 33401
(407) 355-2150

*Brief Due*

*11/20/91*

Counsel for Appellant

91-140483WCR 91-0417
HARDEN, Darryl
vs Florida, State of
4th District Court of Appeal
Melynda Melear

## TABLE OF CONTENTS

**CONTENTS**                                                    **PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . .   i

AUTHORITIES CITED . . . . . . . . . . . . . . . . . . . . . .   vi

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF THE FACTS  . . . . . . . . . . . . . . . . . . .   4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . .   28

### ARGUMENT

### POINT I

   THE TRIAL COURT ERRED IN DENYING APPELLANT'S
   MOTION TO SUPPRESS HIS CONFESSION. . . . . . . . .   29

### POINT II

   THE TRIAL COURT ERRED IN ADMITTING IRRELEVANT
   EVIDENCE OF A WITNESS STATE OF MIND.  . . . . .   37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . .   41

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . .   41

i

## AUTHORITIES CITED

**CASES**                                                                 **PAGE**

Blanco v. State, 452 So.2d 520
    (Fla. 1984) . . . . . . . . . . . . . . . . . . . . . . . . .  29

Brown v. Illinois, 422 U.S. 590
    (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Brown v. Illinois, 422 U.S. 590
    (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

Coladonato v. State, 348 So.2d 326
    (Fla. 1977) . . . . . . . . . . . . . . . . . . . . . . . . .  31

Correll v. State, 523 So.2d 562
    (Fla. 1988) . . . . . . . . . . . . . . . . . . . . . . . . .  38

Downs. v. State, 574 So.2d 1095
    (Fla. 1991) . . . . . . . . . . . . . . . . . . . . . . . . .  38

Dunaway v. New York, 442 U.S. 200
    (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Gerstein v. Pugh, 420 U.S. 103
    (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

Harrison v. State, 524 So.2d 1139, 1140
    (Fla. 2d DCA 1988) . . . . . . . . . . . . . . . . . . . . .  29

Kelly v. State, 543 So.2d 286
    (Fla. 1st DCA 1989) . . . . . . . . . . . . . . . . . . . .  37

Kennedy v. State, 385 So.2d 1020
    (Fla. 5th DCA 1989) . . . . . . . . . . . . . . . . . . . .  37

McNickles v. State, 505 So.2d 633 (Fla. 4th DCA 1987)
    rev. denied, 515 So.2d 230
    (Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . .  35

Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326,
    46 L.Ed.2d 313 (1975) . . . . . . . . . . . . . . . . . . .  34

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,
    1627-1628 (1966) . . . . . . . . . . . . . . . . . . . . . .  33

Owen v. State, 560 So.2d 207
    (Fla. 1990) . . . . . . . . . . . . . . . . . . . . . . . . .  34

Selver v. State, 568 So.2d 1331
    (Fla. 4th DCA 1990) . . . . . . . . . . . . . . . . . . 38

State v. Helton, 551 So. 2d 1267
    (Fla. 1st DCA 1989) . . . . . . . . . . . . . . . . . . 39

State v. Riehl, 504 So.2d 798
    (1987) . . . . . . . . . . . . . . . . . . . . . . . . 29

State v. Rogers, 427 So.2d 286, 288
    (Fla. 1st DCA 1983) . . . . . . . . . . . . . . . . . . 31

Taylor v. State, 355 So.2d 180, 184
    (Fla. 3d DCA 1978) . . . . . . . . . . . . . . . . . . 30

U.S. v. Johnson, 812 F.2d 1329, 1331
    (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . 36

United States v. Brown, 490 F.2d 758,767
    (D.C.Cir. 1973) . . . . . . . . . . . . . . . . . . . . 38

Wells v. State, 540 So.2d 250
    (Fla. 4th DCA 1989) . . . . . . . . . . . . . . . . . . 34

Wong Sun v. U.S., 371 U.S. 471
    (1963) . . . . . . . . . . . . . . . . . . . . . . . . 31

## <u>PRELIMINARY STATEMENT</u>

Appellant was the Defendant and Appellee was the Prosecution in the Criminal Division of the Circuit Court of the Seventeenth Judicial Circuit, In and For Broward County, Florida.

In the brief, the parties will be referred to as they appear before this Honorable Court of Appeal.

The symbol "R" will denote Record on Appeal.

1

## STATEMENT OF THE CASE

The Appellant Darryl Harden was charged by Indictment with Murder in the First Degree (R 949-950). On December 6, 1989 defense counsel filed a motion to suppress the confession of the Appellant (R 951-952). This motion to suppress was subsequently amended on January 9, 1990 (R 954-955). A Motion to Suppress Hearing was held on January 4, 1991 before the Honorable Thomas M. Coker, Jr. (R 1). During the motion to suppress hearing, two state witnesses testified, Detective Palmer and Auer. After hearing testimony from the state witnesses and the defense witnesses during the motion to suppress, the court on January 26, 1990 denied Appellant's motion to suppress his confession (R 956-958).

On November 5, 1990 Appellant's case proceeded to trial before a jury. Defense counsel motioned the Court in limine to prohibit the State from introducing evidence that the Appellant threatened to shoot Kimberly Osgood and that he frequently beat his wife Kimberly (R 121-122). The Court granted Appellant's Motion in Limine as far as the Appellant beating his wife and granted the Appellant's motion subject to review the issue during trial (R 123).

During the State's case, Mr. Osgood, the father of the deceased, testified that when Kimberly Osgood came home off of a date with the Appellant her dress had been torn (R 455). He also testified that he instructed his daughter to move back home from the apartment she jointly shared with the appellant because Mr. Osgood feared for her life if she continued to live with the

2

appellant (R455).   As soon as this evidence was introduced into
evidence, defense counsel moved for a mistrial on the ground that
the State violated the Court's Order granting appellant's motion
in limine (R 455).   The motion was denied and the trial continued
(R 456).   At the conclusion of the State's case, defense counsel
motioned the Court for a judgment of acquittal based on the
insufficiency of the evidence.   The motion was denied by the Court
(R 572-578).   The motion was again renewed at the conclusion of all
the evidence and again denied by the Court (R 769-770).

The jury returned a verdict of guilty of felony murder in the
first degree (R 1005).   A Motion for New Trial was filed with the
Court (R 1012-1013).   Also a Motion for Judgment notwithstanding
the verdict was also filed (R 1014-1015).   Both Motions were denied
by the Court (R 1022-1024).

A sentencing guidelines scoresheet was prepared (R 1009).   The
Appellant was subsequently sentenced to life imprisonment with a
mandatory minimum of twenty five years of incarceration (R 1009,
1011).

Notice of Appeal was timely filed (R 1025) and this Appeal
follows.

## STATEMENT OF THE FACTS

Moses Aaron Osgood, the uncle of Kimberly Osgood Harden, testified that he stayed with his niece at her parents house while her parents were out of town in Georgia during the Christmas holidays during 1988 (R 257).  He testified that Kimberly was married to the Appellant and they lived in an apartment together. Subsequently Kimberly left the Appellant and moved back home with her parents.  During the time when Kimberly Osgood moved from the apartment, Moses Osgood assisted her in moving back with her parents (R 266).  Moses Osgood stated that when he assisted Kimberly in moving back with her parents, they entered into a dark bedroom and found the Appellant standing behind the bedroom door (R 266).

Kimberly Osgood was home living with her parents for approximately three weeks before she was found dead in her parents home on December 28, 1988.  Moses Osgood agreed to stay with Kimberly Osgood while her parents were out of town to assure that she was safe inside of the house (R 258).  Three days before Kimberly Osgood was found dead, the Appellant phoned the victim numerous times requesting that he speak with her on the phone.  At least on one occasion Moses Osgood over heard the victim speaking with the Appellant on the phone (R 259).  Two days prior to her meeting her untimely death she stayed with her Aunt Mattie (R 266). While she was gone from her parents residence, the Appellant phoned the house at least 20 times for two consecutive days requesting to speak with Kimberly Osgood.  Moses Osgood informed the Appellant

4

she was not there and he would hang up (R 262-263).

On December 28, 1988, Moses Osgood left for work at approximately 7:30 a.m.  The last time that Moses Osgood saw Kimberly alive was when she went to spend the night at her Aunt Mattie's house (R 263).  Moses testified that he usually leaves for work at 7:20 in the morning but he was running late.  At approximately 7:30 a.m. the phone rang and it was the Appellant requesting to speak to Kimberly Osgood.  He informed the Appellant that she was not there and he hung up (R 263).  Moses Osgood left for work and once he completed work he returned to Kimberly Osgood parent's residence to check on her.  The first thing that he noticed that the house where Kimberly was inside of was dark.  He stated that Kimberly was always afraid of the dark (R 268).  He entered into the house, cut on the lights and he saw clothes on the floor in his brothers room (R 269).  The room where Kimberly was in was ransacked and Kimberly was laying in the bed with a bedspread up to her chest.  Initially he thought that Kimberly was asleep so he commenced shaking her to awaken her.  Her body was stiff and he screamed out "Kim, Kim, wake up, wake up" (R 270). The phone rang and it was a friend on the phone and he informed his friend that he had to go.  He called 911 and they instructed him to do mouth-to-mouth resuscitation.  He told them it was to late for mouth-to-mouth resuscitation because her entire body was stiff (R 271).  Moses Osgood then believed that the perpetrator was still inside of the house so he became very nervous.  He exited out the house and remained there until the police arrived.  Finally Mr.

Osgood testified that he did not disturb anything in the house including where Kimberly Osgood laid dead in her bed (R 272-273).

Deputy Timothy Duggan, with the Broward County Sheriff's Office testified that he was the first to arrive on the scene at 3321 N.W. 8th Court on December 28, 1988 (R 161-162).   When he arrived at the said address Moses Osgood met him (R 164).   He spoke with Mr. Osgood and subsequently entered into the house along with another deputy (R 165-166).   Once inside of the house he entered into the master bedroom where he observed a black female lying across the bed on her back.   She was fully dressed with a blanket partially covering her body up to her neck or chest area (R 166). Deputy Duggan checked or touched the wrist of the female to check for a pulse as well as the carotid artery on her neck (R 167).   In checking for a pulse, none was found.   No one else was found inside of the house.   The master bedroom was in a disarray but it appeared that the other parts of the home were untouched.   There were numerous electronic pieces of equipment including a television, stereo and other items of value that had been untouched (R 167). Finding this house in a disarray and a black female without a pulse on the bed, Deputy Duggan notified his superiors of the situation and requested additional assistance (R 168).

Detective Jorge Corpion, a forensic detective with the Broward Sheriff's Office testified that he was called to the said address for the purpose of conducting a forensic criminal investigation (R 173).   Upon his arrival he walked around the exterior of the house. While he was walking the exterior of the house, he observed on the

double window of the house possible signs of a forced entry. Additionally a door that was found on the north side of the house had pry marks near the lock area.  In seeing these possible marks indicating a forcible entry, they established there was a possible point of entry through the house by the perpetrator through this laundry door in the laundry room (R 176).  They also found a drywall saw near the door by the laundry room (R 176).  Detective Corpion testified that over objection that he also observed in the patio area an open tool box with similar tools that were also rusted.  He speculated that the saw found near the laundry room door came from the tool box (R 177). *Additionally over objection Detective Corpion testified that in the backyard there was a set of budgie cords that became relevant during the investigation (R 177)*.  In the driveway of the residence, there was a vehicle that had two flat tires (R 178).  The tires were subsequently removed from the vehicle and they found puncture marks in the tires. Inside of the master bedroom, it had been ransacked. The drawers were open, clothing and personal articles were thrown over the bed and the floor, the bathroom showed signs of a struggle and a couple of the pieces that were knocked over put holes in the wall (R 180). The victim was laying face up on the bed with her dress tucked under her.  This indicated to Detective Corpion that the victim had been placed on the bed because the lower part of her dress had been tucked under her right leg (R 180).  On the night stand there was an open bottle of Bufferin that was right next to the bed where the victim laid (R 181).

Once the medical examiner arrived at the scene, they examined the body of the victim laying in the bed (R 181).  They observed small red dots under the eyelids of the deceased that indicated a person choking (R 181-182).  Also Detective Corpion stated that the body was in full rigor mortis which is stiffening of the muscles (R 182).  The police officers discovered a budgie cord adjacent to the body in the bed (R 183).

Detective Corpion testified that they dusted for latent fingerprints but the testing of those latent prints were negative (R 185).

On redirect examination of Detective Corpion, the state moved exhibit LL which were two latent fingerprints into evidence without objection (R 219).  The two latent fingerprints were lifted from a Bufferin box and a hair pick (R 219).  Detective Corpion was subsequently offered and the court declared Detective Corpion as an expert in the field of crime scene analysis (R 223).  He attempted to take latent prints from other objects inside of the house, but it appeared that the objects had been wiped down at one point or another (R 225).

Jeanine McKinsey was declared as an expert in the field latent print examiner (R 531).  She compared state's exhibit 38 which was a latent print lifted from a Bufferin bottle to state's exhibit 52 which was the Appellant's fingerprints (R 535).  In comparing the two prints, she concluded there was a positive identification that was from the Bufferin box print and appellant's latent print from his right index finger (R 537).

8

Dr. Larry Grady Tate a forensic pathologist, Certified Chief Deputy Medical Examiner for Broward County testified that on December 28, 1988, he was called to the said address in reference to a deceased person being inside of the house (R 231). While at the scene, he did a minor external examination of the deceased and concluded that the deceased had probably died by strangulation. The body was transported to the medical examiners office for an autopsy on the same day (R 231). Dr. Tate testified that the room where the body laid was in disarray because all of the dresser drawers had been pulled out and material was out of the closet (R 233). Eight photographs of the deceased were introduced into evidence over objection on the grounds that the probative value outweighed the prejudicial value of the photographs (R 236). After the autopsy was concluded the medical examiner concluded that the cause of death was due to strangulation (R 237). Also found inside of the victims mouth was a white powdery substance that was caked between the teeth of the victim (R 238). Dr. Tate concluded the victim sustained impact on the back of the head and top of the head by some type of blunt object (R 244). The bump on the back of the head could be consistent with somebody being strangled and their head banging into the bathroom wall (R 244). No aspirin was found in the victims stomach. When the medical examiner was questioned as to whether a person could swallow any type of aspirin once that person is dead, he concluded that it would be impossible for the person to swallow (R 245). Finally Dr. Tate concluded that the victim had been dead for approximately 8 to 12 hours from the time

that he first examined the deceased (R 250).

On cross-examination Dr. Tate testified there were signs of a struggle or a fight based on the fact that the deceased had small cuts on the palm of the hand (R 251). The blunt force found on the scalp of the deceased head could have been consistent with a struggle or falling back according to Dr. Tate (R 252).

Lonnie Brown Jr., testified that he lived across the street from the Osgood's residence during the month of December 1988 (R 293). He is not related to the Osgoods. Mr. Brown was shown state's exhibit 23 and 29 for identification. He identified the pictures as the decedent Kimberly Osgood (R 293). The last time that Mr. Brown saw Kimberly alive was on Christmas day where he engaged in a conversation with her (R 295-296). Also on Christmas day, Mr. Brown observed the Appellant passing by in a car with another gentleman riding in front of the Osgood's house going at a slow rate of speed (R 297). On Wednesday, December 28, 1988, Mr. Brown returned to his home between the hours of 4 to 4:30 p.m. He saw the Appellant standing on the side of the road talking to another gentleman that was approximately 5 to 7 blocks from the Osgood's house (R 299). He described seeing the Appellant standing on the corner as unusual because the Appellant failed to wave at him, but merely watched him pass by (R 299).

On cross-examination Mr. Brown testified that the Appellant has a twin brother and he is unable to distinguish the Appellant from his twin brother (R 301). Mr. Brown indicated that Mr. Osgood, Kimberly's father expressed to him that he did not want his

10

daughter to marry the Appellant (R 303).

Mr. Curtis Smith who is also a neighbor of the Osgoods lives approximately 4 houses down from the Osgood's residence (R 307). On December 28, 1988 between the hours of 12 to 12:30 p.m. he observed Darryl Harden walking in the direction of the Osgood's residence (R 309).

However on cross-examination Mr. Smith stated he never saw the Appellant enter into the Osgood's residence (R 309) or in front of the Osgood's residence (R 310).

Detective John Auer of the Broward Sheriff's Office is a supervisor of the homicide division. He testified that he was called to the said address in reference to a suspicious death (R 313). Upon his arrival he initially met with Moses Osgood, Detective Palmer and other officers involved in the case. He observed that a Toyota Tercel's front two tires were flat (R 314). He entered into the residence and went inside of the master bedroom where he observed a body lying on the bed face-up with the bedcovers up to the chest (R 323). He described the master bedroom as being completely destroyed. It was ransacked, articles of clothing were thrown about the floor, the dresser drawers were taken from the dressers had been thrown on the floor and about the bedroom, papers and articles had been thrown about in a "haphazard fashion" (R 324). He described the rest of the house as "immaculate" (R 324). Detective Auer found three budgie cords that were located in the house. One of the cords was on the left side of the deceased, the second budgie cord was in the back yard and

11

the third budgie cord was on the deck of a boat in the back (R 326).  In doing the walk through the residence, Detective Auer found evidence to indicate there was forced entry into the house. He discovered that on the west wall of the house there were two windows that had screens which indicated it had been pried.  The windows were locked from the inside and there were pry marks on it. Detective Auer went inside and looked at the windows and it appeared they had not been opened (R 327).

Detective Auer then went and examined the Toyota Tercel with the two flat tires.  He found there were two puncture wounds to the front tires (R 329).  Inside of the bathroom, it appeared that there was a hole in the bathroom wall that indicated that something hit the wall and caused damage to it (R 332).

After completing the investigation at the residence, Detective Auer spoked with Robert Harden, the father of the Appellant and his brother Wayne Harden (R 334).  He questioned them in reference to the Appellant's and Kimberly Osgood Hardens marital problems (R 334).  Subsequently he went to the Appellant's house accompanied with Detective Palmer and Robert Harden (R 334).  Once at the house, Mr. Robert Harden invited the detectives inside of his house.  Inside of the house were a number of people including his father and brothers.  Darryl Harden, the Appellant came from the back room into the living room where the detectives were waiting for him.  They requested him to come down to the police station to discuss the case because there would be no distractions at the station.  He was not placed under arrest and no force was used

12

against him to transport him down to the police station (R 336).
At the police station the Appellant was offered food, the restroom
facilities and water.   He refused the food and the restroom
facilities but agreed to have water (R 337).   His <u>Miranda</u> rights
were read to him and he indicated that he understood the rights
that were advised him (R 338). After the reading of the rights the
Appellant signed the bottom of the form and initialled each right
(R 338).   Detective Auer questioned the Appellant as to his
whereabouts on December 28, 1988.   The Appellant indicated to
Detective Auer that he did not know how Kimberly died, that he was
with his friend by the name of Ricky Kendrick and had played
basketball (R 340-341).   Detective Auer told the Appellant he did
not believe him and informed him that he believed this was a
domestic related type incident whereby Kimberly was killed.   The
Appellant at this point hung his head down and took a deep breath.
He then looked up and said, "I did it.   I will tell you all about
it" (R 342).   The Appellant indicated in his unrecorded statement
that on December 28, 1988 he was with Kimberly on the Tuesday night
before she was killed.   Kimberly picked him up and they discussed
their reconciliation.   Kimberly dropped him off at 10:00 on Tuesday
night and she was suppose to call him. She never did (R 342).   On
the next day which was Wednesday, December 28, he went to
Kimberly's fathers house at 10:00 a.m. and waited for Kimberly to
come home.   He waited for Kimberly to return home behind a gate.
When he saw Kimberly drive up into the driveway, he waited for her
to go inside of the house.   Once inside of the house he came from

13

the backyard and put two holes in each of her front two tires.  He
then entered into the house through a side door that was unlocked
(R 344).  Once inside he waited for Kimberly Osgood Harden to come
from outside of the bathroom.  He heard the toilet flush and she
came outside of the bathroom and went into the master bedroom.  She
was dressed in her panties and a bra.  He confronted Kimberly and
grabbed a hold of her.  She struck him and a struggle ensued.  He
placed his hand around her neck and began to choke her.  He told
the detectives that he did not know how long he choked her but
after a period of time, she was not moving.  She was not breathing.
He attempted to revive Kimberly but without success.  He placed
Kimberly on the bed, dressed her in clothes and then went inside
of the bathroom and retrieved aspirin.  He placed the aspirin in
her mouth and pushed it down to indicate that she attempted to
commit suicide (R 345).  He then ransacked the master bedroom to
make it appear that someone had burglarized the house (R 346).  At
the conclusion of the verbal statement, Detective Auer requested
the Appellant to give a taped statement.  The Appellant agreed to
give a recorded statement which lasted approximately 1 hour.  In
the second statement the Appellant changed his version of the
events that occurred on December 28, 1988.  The only difference in
the verbal statement and the tape recorded statement was that the
Appellant and the victim were fighting prior to her being strangled
to death (R 389).  The remainder of the statement was consistent
with his verbal statement.  The Appellant in his first recorded
statement to the detectives eluded most of the answers and failed

14

to answer all of the questions posed to him by the detectives (R 410-415).    Finally  at  the  conclusion  of  the  first  recorded statement the Appellant told the detectives after they continued to badger him to answer the questions that he did not have anything further to say (R 413).

The detectives again questioned the Appellant on a second recorded statement (R 415-416).  In the second recorded statement the Appellant answered all of the detectives questions.  His second recorded statement was also consistent with the verbal statement that he gave.

On December 26, 1988 Charles Jackson testified that he saw the Appellant at the Osgood's residence between the hours of 11 and 11:30 a.m. knocking on the door.  Initially the Appellant knocked on the front door for about a minute and yelling out to the occupants of the house to open the door. When no one opened the door, he went to another door on the side of the house and continued to knock and yell to open the door.  No one opened the door (R 433-434).  On Wednesday, December 28, 1988 Charles Jackson stated that he observed the Appellant at the Osgood's residence at approximately 12:00 p.m. (R 434).  Later on in the evening, when the police arrived at the Osgood's residence Charles Jackson testified that he believed in his heart that he observed the Appellant standing in the crowd watching the police (R 435-436).

On  cross-examination  Charles  Jackson  stated  that  he  was unaware that the Appellant had a twin brother. On December 29 when questioned by the detective, Charles Jackson stated that he did not

15

see Darryl Harden on Wednesday, December 28 (R 439).  But Charles Jackson did not remember giving that statement to the police during his cross-examination.

Debra Cooper a neighbor of the Osgoods testified that on Tuesday, December 27, 1988 she observed the Appellant knocking at the door of the Osgood's residence.  After no one answered the door he moved to a side door and began banging on the door for approximately 5 minutes.  When no one answered he began to walk away from the house.  Subsequently Kim Osgood came from inside of the residence to see who was outside.  As soon as she returned inside of the residence, the Appellant returned and then began banging on the door and yelling for her to come from inside of the residence.  When Kimberly Osgood did not open the door the Appellant left the residence but he was gesturing and moving his mouth, pointing with a clenched fist and pointing his finger back at the house (R 450).

Robert Osgood, the father of Kimberly Osgood testified that on December 28, he went to Georgia with his wife and grandchild. He left Kimberly at his residence and requested his brother Moses Osgood to stay with Kimberly.  He stated that Kimberly's relationship with the Appellant was a very strange relationship and described the Appellant as being very demanding, total control over Kimberly and dictated her life (R 462).  He requested Kimberly to move back to his residence from the apartment she jointly shared with the appellant because he feared for her life (R455).  On one particular occasion, the Appellant and Kimberly were on the

16

telephone speaking with each other.  Kimberly was at the residence of Mr. Osgood.  He walked into Kimberly's room and she was crying and the voice on the phone was screaming at Kimberly (R 465).

On cross-examination Mr. Osgood stated that he was angry when he found out that Kimberly had married the Appellant (R 466). Subsequently Kimberly returned to Mr. Osgood's residence, he instructed the Appellant to never come on his premises (R 471). Mr. Osgood had no personal knowledge whether or not Kimberly had invited the Appellant to his residence after he and his wife fell asleep (R 472).

Mattie Mikey, the aunt of Kimberly Osgood confirmed that Kimberly definitely spent the night with her on December 27, 1988. She testified that Kimberly and the Appellant had marital problems and they were separated during the period that she stayed with her. They had only been married 3 months prior to them separating.  On December 27, 1988 Mattie Mikey also confirmed that the Appellant and Kimberly Osgood did have contact with each other on that evening.  The last time she saw Kimberly alive was the morning of December 28, 1988 when she returned to her own residence (R 489-493).

On cross-examination Mattie Mikey testified that she never saw the Appellant threaten or make Kimberly Osgood feel intimidated (R 501).  Also when Kimberly Osgood left her Aunt Mattie's house on the 28th of December, she never told her aunt that she was upset with the Appellant (R 509).

Dawn Norris, an administrative assistant at the Broward

17

County Library testified that she was Kimberly Osgood Harden's supervisor during the period of December 1988. Ms. Norris testified that on December 28, 1988, Kimberly Osgood Harden failed to come to work and she became concerned for her because it was unusual for her to come to work late or not call to inform her that she would not be in to work (R 539-540). At approximately 2:00 p.m., Ms. Norris telephoned Kimberly Osgood's residence and the phone rang and someone subsequently answered the telephone. At first there was no response. The person on the other end of the phone hung up the phone and she thought that she was merely disconnected. She called a second time and the phone was picked up and someone said nothing. Her immediate thought was that Kimberly Osgood was in trouble and maybe she needed to take time off. She called again and the person on the other end picked up the phone and said nothing. Ms. Norris said on the phone thinking that she was talking to Kimberly Osgood that she didn't have to come to work that day and if she needed help to let her know. The phone was hung up by the person on the other end. Ms. Norris stated she never knew who was listening to her on the other end of the phone (R 541).

Allison Ellis testified that she previously worked with Kimberly Osgood during the period of December 28, 1988. Kimberly and Allison had previously arranged that Kimberly would pick her up on her way going to work on December 28. When Kimberly failed to come pick her up at there scheduled time, Allison made other arrangements for transportation. At approximately 3:00 p.m. on

18

December 28 she telephoned Kimberly's residence and no one answered the phone (R 550-551).

State witness Deandre Brown testified on Saturday, December 24, 1988 he spoke with Kimberly Osgood Harden at her front door at her father's residence. As they were talking the Appellant came up and demanded him to leave and questioned him as to why he was talking to his wife (R 556). The Appellant told Deandre Brown, "if he can't have her nobody else can" (R 556).

On the following Monday, Mr. Brown saw the Appellant knocking on Kimberly Osgood's door. He returned to his car and waited for Kimberly as she came out of the house. They left together.

A couple of days prior to Kimberly Osgood meeting an untimely death, Mr. Brown overheard a conversation between Kaylor Hilton, his girlfriend, her brother and the Appellant. He heard the Appellant state, "If she passed by right now, he would shoot her" (R 560). Mr. Brown stated that the Appellant was referring to Kimberly Osgood. Subsequently on December 28, 1988 at 12:30, Mr. Brown saw the Appellant enter into Kimberly Osgood's residence through a door (R 560).

On cross-examination Mr. Brown stated that he did not see the Appellant attempt to break a window or attempting to hide anywhere at the Osgood's residence on December 28, 1988. He stated that he and the Appellant never got along but he was close friends with Kimberly Osgood (R 562). The most significant testimony that Mr. Brown testified to on cross-examination was that Kaylor and her brother probably would not confirm that the Appellant stated that

19

if Kimberly passed by, he would shoot her (R 563).

Defense witness, Kaylor Michelle Hilton testified that she dated Deandre Brown up until November 1989 (R 584). During the Christmas Holidays of 1988 she recalled a conversation with Darryl Harden, her bother James Hilton and Deandre Brown. She testified at no time did Darryl Harden the Appellant state that he would shoot his wife or threatened to kill his wife (R 585-586).

Mabelina Hines testified that on several occasions the appellant had his son over to his mother's house. On December 19, 1988, Kimberly Osgood's father was at the Harden's residence where he threatened to kill the Appellant (R 595). The police had to be called and subsequently Mr. Harden left.

Gerald Harden, the twin brother of the Appellant testified that on December 28, 1988 when he found out that Kimberly Osgood Harden was dead, he went to her house and stayed out to her house for approximately one hour (R 608). He also testified that subsequent to Darryl Harden and Kimberly Osgood's separation, they continued to see each other.

Amanda Harden, the mother of the Appellant testified that her son the appellant and Kimberly Osgood were together frequently during December, 1988. She would come to their house and have dinner with the family (R 613-614). Mrs. Harden corroborated Greg Harden's testimony that there was an argument at her home between Darryl Harden and Kimberly Osgood Harden's father. On December 28 Mrs. Harden testified that Kimberly Osgood called her house at 6:30 a.m. requesting to speak to the appellant (R 622).

The appellant testified that he married Kimberly Osgood Harden on September 22, 1988 (R 635). They subsequently moved into Kimberly Osgood father's apartment and lived there as husband and wife along with their child and Kimberly Osgood's uncle. Prior to them getting married they did not inform Kimberly Osgood's father that they would be married (R 638). They lived in the apartment up until November 1988. Kimberly and the Appellant had an argument over Kimberly transporting him to work. The argument exploded into a family dispute between Kimberly Osgood's father and the appellant. The argument took place at the Appellant's mother's house after the Appellant removed Kimberly Osgood's car and her son and drove the car and the son to his mother's house (R 642). After this argument, Kimberly and the Appellant separated but continued to see each other. The Appellant lived with his mother and Kimberly lived with her parents. On the night that Kimberly and the Appellant separated, Kimberly called the appellant and requested him to ride with her to pick up pizza for her family. Instead of Kimberly Osgood driving to the appellant's house, she picked him up at the corner of his house. Kimberly Osgood felt because of the argument between the Appellant and her father that appellant's mother would dislike her (R 653). The Appellant testified that Kimberly was always concerned with what her father would think of her if she continued to see him. They agreed that they would move to California to be away from their immediate families. But Kimberly subsequently changed her mind (R 655).

During the month of the December, 1988 the appellant continued

21

to see Kimberly Osgood. Kimberly would sneak the Appellant into her parent's home after 11:00 p.m. every night (R 657). They continued to have an intimate relationship with each other (R 657). However Kimberly Osgood never allowed the Appellant to sneak into her parent's house during the day for fear that neighbors would see him coming inside. Her father frequently discussed his problems with the neighbors and requested the neighbors to always  watch the house (R 659).

On Christmas Day 1988 the Appellant and Kimberly spent the day together.  They went to Church and to the beach (R 659-661). Appellant insisted that he never forced Kimberly Osgood to be with him or to see him (R 661). As a matter of fact Kimberly Osgood would volunteer to come and pick him up from the corner of his house (R 662).

The Appellant described the incident with Deandre Brown as being insignificant.  The Appellant testified that he did not dislike Deandre Brown but he felt that Deandre had an attitude with him. On December 26, 1988 Deandre and Kimberly Osgood were talking when the Appellant approached the two. The Appellant stated, "what is up?".  Deandre told the Appellant that he was not supposed to be at the house and the Appellant responded that he should not be at the house as well (R 664-665).  The Appellant never attempted to strike him nor Deandre Brown attempt to strike him (R 665).  The Appellant informed Kimberly Osgood that he would talk to her later and he left.  Kim Osgood went inside the house (R 665).  The Appellant denied ever telling any person that he would shoot his

wife (R 666).

On the 26th of December 1988, the Appellant asked Kimberly Osgood if she was ready to reconciliate the marriage. Kimberly Osgood stated that she felt that her father would object and she was not ready to reconciliate the marriage. The Appellant kissed her on the jaw and left her residence (R 668).

On December 27, 1988 Kimberly Osgood phoned the Appellant and requested that she see him after she got off from work at 8:00 p.m. (R 669). The Appellant met Kimberly Osgood at her aunt's house. The Appellant and Kimberly Osgood then left the aunt's house and rode to John Eastland Park in Fort Lauderdale (R 671). While at the park, Kimberly Osgood and the Appellant discussed getting back together. After the conversation they began kissing and eventually had sex (R 674).

On December 28, 1988 Kimberly Osgood phoned the Appellant at approximately 6:30 a.m. at the Appellant's mother's house. The Appellant's mother woke him up and he came to the phone and spoke with Kimberly. At 9:30 the same morning Kimberly called the Appellant and asked him to come to her parent's home that day. The Appellant was reluctant because he stated that her uncle would be at Kimberly's parent's home (R 677). After the conversation on the phone the Appellant laid back down in the bed and decided that he would go to Kimberly's parent's house anyway. He was apprehensive about going because he had never snuck into Kimberly's house during the day time (R 678). The Appellant had intended to ask Kimberly to stay home with him during the day and not go to

23

work.  He felt that he was closer to getting Kimberly to agree to
come back to him and reconciliate the marriage.  The Appellant was
feeling confident that Kimberly would agree to continue their
marriage (R 681).  Once the Appellant got to the Osgood's residence
he went in through the back gate.  Initially when he got to the
Osgood's residence he did not see Kimberly Osgood's car (R 684).
Kimberly Osgood eventually drove in the driveway and entered into
her house (R 685).  The Appellant did not attempt to break through
any windows.  The Appellant knew that when Kimberly forgot her keys
to the house that she would go under a rug in front of the outside
door and use a metal object to open up the door (R 68).  He went
and retrieved the same metal object and unlocked the door. But
before entering the door he punctured Kimberly's tires so that she
would have an excuse to not to go to work and spend the day with
him (R 686-687).  Appellant insisted  that when he punctured the
tires his only intention was to keep Kimberly home with him so that
she would not have to go to work.  He was not angry at Kimberly
(R 687).  The Appellant entered into Kimberly's house and set on
the bed and waited for her while she took a bath.  When the
Appellant came from out of the bathroom, she said "oh, what you
doing here?" (R 689).  The Appellant responded that he wanted to
talk to her and she became hysterical  (R 691).  Kimberly became
aggravated with the Appellant and started swinging at him (R 691).
The Appellant held Kimberly's arms so that she would not hit him
and then she spit in his face.  The Appellant lost grip of
Kimberly's arms and she started swinging again at the Appellant.

24

(R 694).    The Appellant grabbed Kimberly around her waist to attempt to calm her down.  He then grabbed her around the neck so that he could talk to her (R 695).   The Appellant stated it was never his intention to kill his wife.  He had no idea that while his hands were around her neck that Kimberly was dying (R 695). Kimberly stopped moving and he administered CPR on her (R 696). The Appellant panicked and grabbed some red pills from a pill box. He put the pills in her mouth because he wanted to make it appear that she committed suicide (R 698).  The Appellant left Kimberly's house at approximately 12:30 p.m.   He denied being in Kimberly Osgood's house at 3:00 p.m. and he never answered any telephone at the Kimberly's house on December 28, 1988 (R 699).  The Appellant testified before leaving Kimberly Osgood's residence that he placed aspirin in Kimberly's mouth and he threw articles around in the room to make it look like a burglary (R 669).  The Appellant had no intentions of ransacking the Osgood's residence prior to him going inside of the house.  He never planned to fight with Kimberly and he did not enter into any other part of the house while he was there (R 699).  The Appellant denied using a towel or cloth to wipe anything off while he was inside of the Osgood's residence.

The Appellant said the bungie cord was already inside of the room before he came in there.  He denied having used this cord (R 700).  The Appellant picked Kimberly up off the floor and placed her into the bed.  The Appellant repeated to Kimberly Osgood while she was dead that he loved her and he put her clothes on (R 701).

The Appellant left Kimberly Osgood's house and went walking

25

but doesn't remember where he walked (R  703).  However, the Appellant did recall going to his friend's house a Mr. Kendrick and told him that if his mother ask him where he was to state that he was with him (R 704).

When the Appellant went home, his father asked him if he knew what happened to Kim who was found dead.  The Appellant did not discuss with him anything but when his father saw his reaction, he said "oh my God what did you do?" (R 705).  The Appellant went into the bedroom laid down and thought about what he had done.

Subsequently the detectives came to his house and told him they wanted to speak with him and he went down to the police station with them.  But before going to the station his sister Geneva asked the police officers why can't you all talk to him here.  The police officers responded that it would be best to speak with the Appellant at the police station (R 706).

At the police station the Appellant told the police that he had been with Ricky Kendrick his friend on the day of the December 28, 1988.  The Appellant stated he had in fact been with Ricky Kendrick on that day.  The Appellant stated during the tape recorded statement that he felt very remorseful as to what happened and wished that he could bring his wife back (R 708).

## SUMMARY OF THE ARGUMENT

### POINT I

The trial court erred in denying appellant's motion to suppress his confession. The two detectives who went to appellant's house had no probable to seize the appellant from his house and transport him to the police station.

Additionally, during the questioning of the appellant, he unequivocally invoked his constitutional right to remain silent by stating "that's all I have to say" (R413). The detectives ignored the appellant invoking his right to remain silent and continued to question the appellant where he gave a tape recorded confession.

The appellant's confession should have been suppressed by the trial court.

### POINT II

The trial court permitted irrelevant evidence to be introduced during appellant's trial. The victim's father testified that he feared that if his daughter continued to live with the appellant, her life would be in jeopardy. The victim's father state of mind was not placed in issue during the trial and his opinion was irrelevant. The only purpose the statement served was to show that the appellant had a preconceived design to kill the victim.

## ARGUMENT

### POINT I

THE TRIAL COURT ERRED IN DENYING APPELLANT'S
MOTION TO SUPPRESS HIS CONFESSION.

a.  Whether the law enforcement officer had probable
cause to seize the appellant.[1]

An individual may not be seized and taken to police
headquarters for questioning, absent probable cause.  Dunaway v.
New York, 442 U.S. 200 (1979).  The probable cause necessary for
such a seizure is analogous to the probable cause required for an
arrest.  Harrison v. State, 524 So.2d 1139, 1140 (Fla. 2d DCA
1988).

A law enforcement officer has probable cause to make an arrest
only if he has reasonable grounds to believe that the person
arrested has committed a felony.  Blanco v. State, 452 So.2d 520
(Fla. 1984).  Probable cause is defined as facts and circumstances
sufficient to warrant a reasonable man in believing that the person
arrested has committed the offense.  Gerstein v. Pugh, 420 U.S. 103
(1975); see also State v. Riehl, 504 So.2d 798 (1987).

In the instant case, the law enforcement officer had no
reasonable belief that the Appellant had committed any criminal
offense.  In fact, the detectives had no information to connect the
Appellant to the alleged crime, other than the fact that the
Appellant and victim were married.  The detectives ventured to the
Appellant's house simply because he was the victim's husband.  This

---

[1] This is essentially the same argument that was asserted by
defense counsel in his written memorandum of law in support of the
defendant's motion to suppress.

was the natural starting point for their investigation.   The
detective testified that appellant was one of many possible
suspects.  When the detectives entered and seized the Appellant in
his home they had no fingerprint evidence connecting the Appellant
to  the alleged crime, nor was there any other evidence placing the
Appellant at the scene of the alleged homicide.   In short, the
detectives has no reasonable belief, based on the facts and
circumstances known to them, that Appellant had committed any
crime.  Thus, the seizure of the Appellant must be deemed illegal.
Contrary to the trial court's order which states that the officers
"invited" the appellant down to the station, the appellant had no
choice in going to the police station because Detective Palmer
stated the appellant would be more comfortable at the station
(R36).

Thus, the illegal seizure presumptively taints and renders
involuntary any subsequent confession or admission proffered by the
victim of the illegal seizure.  Brown v. Illinois, 422 U.S. 590
(1975); see also Taylor v. State, 355 So.2d 180,d 184 (Fla. 3d DCa
1978). The confession remains tainted unless there is some event
in the causal chain that would remove that taint.  Taylor, 355
So.2d at 184.

In the case at bar, there is simply no event that dissipates
the taint of the illegal seizure.  The Appellant gave his alleged
confession within hours of the illegal arrest.  His alleged
confession was a direct exploitation of the illegal seizure.  No
doubt the State will point to the fact that the appellant was

allegedly advised of his Miranda rights and allegedly waived such rights as dissipating the taint of the illegal seizure.

However, Miranda warnings do not per se remove the taint of an illegal seizure, and an admission subsequent to an illegal seizure may still be held inadmissible, despite Miranda warnings. Brown v. Illinois, 422 U.S. 590 (1975); see also State v. Rogers, 427 So.2d 286, 288 (Fla. 1st DCA 1983).

Consequently, the subsequent confession allegedly made by the Appellant must be held inadmissible under the exclusionary rule. Wong Sun v. U.S., 371 U.S. 471 (1963); Coladonato v. State, 348 So.2d 326 (Fla. 1977).

b.   Whether the appellant invoked his constitutional right to remain silent.

The appellant contends that the trial court erred in denying his motion to suppress his confession.  Specifically the appellant asserts that during his statement to the detectives, he invoked his right to remain silent and the detectives continued to question him despite this invocation of his right to remain silent.

The appellant was transported to the police station by two detectives, Auer and Palmer, in order to question the appellant in reference to Kimberly Osgood's untimely death.   The appellant accompanied the detectives to the police station upon being demanded by the detectives to go to the station.  At the station, the detective read the appellant his Miranda rights and the appellant acknowledged that he understood said rights.   The appellant's first statement to the detectives was a verbal

30

statement where the appellant allegedly described what occurred at Kimberly Osgood's home on December 28, 1988 (R 340-347). The detectives requested the appellant if would give a tape recorded statement (R348). The appellant agreed to give the tape record statement. The <u>Miranda</u> rights were not reread to the appellant. During the recorded statement, the appellant became reluctant to answer the detective's questions and failed to answer the detective's question but repeatedly stated that he loved his wife (R43,417). During the motion to suppress hearing, Detective Palmer testified that the appellant stopped answering any questions on the taped statement. The tape was stopped and the detectives urged the appellant to continue talking (R39). No <u>Miranda</u> rights were advised to the appellant after he refused to talk (R43) and the detectives never told the appellant after he refused to talk that he had a right to counsel (R71). The detectives attempted to persuade the appellant to answer the questions and stated to the appellant that he was "skirting the issue" (R410) and demanded the appellant to "answer the question (R410). This scenario went on for seven (7) pages in the record of appeal (R407-413) until finally the appellant unequivocally invoked his right to remain silent by stating, "That's all I have to say" (R413). During the motion to suppress hearing, the appellant testified that the detectives told him after he answered the questions he could be back with his family (R91). This issue for appellate consideration was specifically persevered  (R 216,311,339).

In <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 1627-1628

31

(1966) the Supreme Court stated "if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."   In interpreting the "right to cut off questioning" passage in Miranda, the Supreme Court determined that the admissibility of statements obtained after a suspect has decided to remain silent depends on whether his "right to cut off questioning" was "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). In order to scrupulously honor a suspect's right to cut off questioning, the police must immediately cease the interrogation, resuming questioning only after the passage of a significant period of time and a fresh set of warnings, Mosley, 96 S.Ct. at 327.

In Wells v. State, 540 So.2d 250 (Fla. 4th DCA 1989), the defendant was arrested at the scene of the crime and read his Miranda rights where he invoked his right to remain silent.   The defendant was not questioned at the crime scene or while he was being transported to the police station.   Two hours elapsed between the defendant invoking his right to remain silent and the police requestioning him.   The police reminded the defendant that his constitutional rights were still in effect and asked the defendant if he understood the rights.   The appellant acknowledged the rights and stated he understood the rights.   The appellant then confessed to the crime.   The court ruled two hours was sufficient passage of time so as to permit the police to resume questioning after repeating the Miranda warnings.   See also Owen v. State, 560 So.2d

207 (Fla. 1990) where the Supreme Court found it to be reversible error for the police to urge the defendant to continue his statement after he had invoked his right to remain silent.

Additionally in McNickles v. State, 505 So.2d 633 (Fla. 4th DCA 1987) rev. denied, 515 So.2d 230 (Fla. 1987), this court held that an interval of forty-five minutes was a significant passage of time between the invocation of the right to remain silent and the resuming of the questioning of the defendant.

Unlike the defendants in Wells and McNickles, the detectives in the instant case did not stop questioning the appellant but stopped the recording of the statement. A discussion ensued between the appellant and the detectives as to what would happen to the appellant (R 413-414). Detective Auer then questioned the appellant why he stopped answering the questions on the taped statement and the appellant agreed to go back on tape and give a statement. Only a mere eleven (11) minutes elapsed between the stopping of the first tape statement and the commencing of the second tape statement (R416). No Miranda warnings were ever reread to the appellant and the police failed to instruct the appellant that Miranda was still in effect (R43). The detectives never stopped questioning the appellant once he invoked his right to remain silent (R417).

In the second tape recorded statement to the detectives from the appellant, he gave a full confession to the detectives that was admitted in court over objection (R416).

It was reversible error for the police to continue questioning

33

of the appellant without first allowing a significant passage of time to elapse before again questioning the appellant.  Moveover they failed to advised the appellant of his constitutional rights to remain silent.

The admission of the appellant's confession during the state's case-in-chief cannot be deemed harmless since the appellant took the witness stand during trial.  Without the incriminating statement being introduced during the state's case, the appellant may not have testified at all.  It is reasonable to conclude that the jury relied heavily on appellant's statement to reach its verdict of guilty.  The court in U.S. v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) held the erroneous admission of a defendant's inculpatory statement is not harmless by the defendant's admission on the witness stand of participation in some criminal activity.

Accordingly the trial court's order denying his motion to suppress his confession must be reversed and remanded for a new trial.

<u>POINT II</u>

THE TRIAL COURT ERRED IN ADMITTING IRRELEVANT
EVIDENCE OF A WITNESS STATE OF MIND.

During the testimony of the victim's father, Robert Osgood, testified that he took his daughter, Kimberly, back into his home because he feared for her life if she continued to live with the appellant in the apartment that Kimberly and the appellant jointly shared (R455). The appellant contends that this testimony should have been excluded because it was irrelevant.

Prior to trial, the appellant moved in limine to exclude all evidence that the appellant beat his wife and was violent (R121). Both the prosecutor and the defense counsel stipulated to exclude the prejudicial evidence. The motion was granted by the court (R121). Immediately following the introduction of the prejudicial evidence by Robert Osgood, defense counsel moved for a mistrial on the grounds that the court's order excluding the prejudicial evidence was violated (R455). The motion was denied (R456).

A homicide victim's state of mind prior to the fatal event is generally neither at issue nor probative of any material issue raised in a murder prosecution. <u>Kelly v. State</u>, 543 So.2d 286 (Fla. 1st DCA 1989). In <u>Kennedy v. State</u>, 385 So.2d 1020 (Fla. 5th DCA 1989) two witnesses testified that the victim told them he feared for his life against the defendant. One of the two witnesses also testified that in her opinion the deceased was in fear of the appellant. The court ruled that the statements of the contents of what the victim told the third parties were hearsay. Additionally the court ruled that the test for the admissibility

35

of the said statements was one of relevancy of the statement to an issue of proof.  The court relied on <u>United States v. Brown</u>, 490 F.2d 758,767 (D.C.Cir. 1973) in deciding whether the statements are relevant.  The court held that the statements must be relevant to a defense asserted by the defendant such as suicide, accident, self-defense or any other defense where the prior threats made against the deceased, or the deceased's state of mind.  Finally the court concluded that the victim's state of mind was not in issue. The court stated the only purpose the statements served was to show the truth of its content, i.e. that the defendant had a preconceived design to kill the deceased.  Such statement is irrelevant to the issues at trial.  Other courts have also followed this same holding.  See <u>Selver v. State</u>, 568 So.2d 1331 (Fla. 4th DCA 1990); <u>Correll v. State</u>, 523 So.2d 562 (Fla. 1988). <u>Downs. v. State</u>, 574 So.2d 1095 (Fla. 1991).

Likewise, in the instant case, Robert Osgood's state of mind was irrelevant during the appellant's murder trial.  It was his opinion like the witness in <u>Kennedy</u>, <u>supra</u> that he feared that  if Kimberly continued to live with the appellant, her life would be in jeopardy.  Robert Osgood's state of mind was never placed in issue in order to be relevant during the trial.  The appellant concedes that his testimony failed to rise to hearsay but does contend that it was irrelevant as to what he believed.  Applying the test of admissibility enunciated in <u>Kennedy</u>, the appellant never asserted the defense of self-defense, accident or suicide. The only purpose the evidence served was to show was to show that

the appellant had a preconceived design to kill Kimberly.  Such statement is irrelevant to the issue at trial.

Furthermore during appellant's motion for mistrial, defense counsel argued that the order granting his motion in limine was violated because Robert Osgood alluded indirectly to acts of violence and beatings of the victim by the appellant.  His testimony was extremely prejudicial to the appellant's case and frustrated the court's order to exclude such evidence.  The admission of the prejudicial evidence was harmful to the appellant's case because the evidence showed that appellant had a preconceived design to kill Kimberly.  A new trial is warranted where the prosecutor has presented inadmissible evidence that may have influenced the jury to arrive at a verdict it otherwise might not have reached.  State v. Helton, 551 So. 2d 1267 (Fla. 1st DCA 1989).

Accordingly, appellant's sentence and conviction must be reversed and remanded for a new trial.

## CONCLUSION

Based on the foregoing arguments and the authorities cited therein, Appellant respectfully requests this Honorable Court to reverse this cause and remand for a new trial.

Respectfully submitted,

RICHARD L. JORANDBY
Public Defender

MALLORYE CUNNINGHAM
Assistant Public Defender
Florida Bar #0561680
15th Judicial Circuit of Florida
The Governmental Center/9th Floor
301 North Olive Avenue
West Palm Beach, Florida  33401
(407) 355-2150

Counsel for Appellant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy hereof has been furnished to JOAN FOWLER, Assistant Attorney General, Elisha Newton Dimick Building, Suite 204, 111 Georgia Avenue, West Palm Beach, Florida, 33401 by courier this  31ST   day of October, 1991.

Of Counsel

38

EXHIBIT   "C"

## GROUND SIX

TRIAL COUNSEL FAILED TO INVESTIGATE AND ARRANGE
FOR A DEFENSE THAT PETITIONER WAS MENTALLY IN-
COMPETENT OR INSANE AT THE TIME THAT THE CRIME
WAS COMMITTED, WHICH WOULD ALSO BE PERTINENT TO
THE ISSUE OF VOLUNTARINES OF CONFESSION MADE BY
PETITIONER, THEREBY RENDERING TRIAL COUNSEL IN-
EFFECTIVE IN HIS REPRESENTATION OF DEFENDANT.

Petitioner was mentally incompetent and/or not in a sane state
of mind when the crime was committed, or when the tape recorded
confessions were given to the police. Lokos v. Capps, 528 F.2d
576, appealed after remand 569 F.2d 1362, appealed after remand
625 F.2d 1258, rehearing denied 631 F.2d 732. Petitioner claims
and asserts that his defense counsel should have known this and
investigated and arranged for a defense that petitioner was men-
tally incompetent or insane at the time that the crime was comm-
itted. This issue should also have been pertinent to the defense
when the issue of voluntariness of the confession made by petiti-
oner was brought before the court on the suppression motion.

Petitioner was examined by a court appointed Psychiatrist, Doc-
tor Stillman, but before petitioner could come to trial Doctor
Stillman passed away, so his testimony, whatever it might have
been, could not be given at the jury trial. Defense counsel
should have motioned the court for another continuation and had
petitioner examined by another psychiatrist, and failure to do
so, rendered trial counsel ineffective in his representation of the
petitioner.

19

## GROUND SEVEN

### DENIAL OF EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL.

Petitioner incorporates all of the above six (6) grounds into this ground, especially all claims of ineffective assistance of of counsel, asserting and claiming that his Constitutional Right to effective assistance of counsel by his trial and appellate counsel. Petitioner's trial counsel did not investigate, nor properly prepare for the jury trial. Trial counsel should have prepared for the offense of burglary and felony murder, and prepared/arranged for the possible defense of mental incompetency. Appellate counsel should have raised and argued all defensesthat were denied by the trial court and that the verdict was contrary to the evidence. Appellate counsel should have raised and argued that the evidence that was presented during the trial only at best supported a finding of guilty to a second degree murder charge or manslaughter.

Although a layman at law and inarticulate, the petitioner's writ is made in good faith on cognizable grounds, and it would seem that the ends of justice, particularly under due process and equal protection, might best be served by the court affording the petitioner an evidentiary hearing, so that he can clarify the issues and ascertain the full and complete facts upon which the writ is based.

At the time of this Petitioner's jury trial, petitioner had no understanding or very little understanding of the law and procedures, or of his protected rights in interest under the law. Thus, he had to rely solely upon the advice of counsel. The petitioner did have a prior criminal record, but had only a little experience with the awesomely imposing persona of the court system.

20

The petitioner was wholly reliant upon a community of lawyers
in seeking due process, some semblance of fairness, and equal pro-
tection before the bench in this case, under the constitutional and
laws of the United States and the state of Florida.

Moreover, the petitioner must now rely upon assistance from
a certified paralegal in obtaining legal papers and proper plead-
ings before the court.

In the case at bar, little uncertainty should exist because
the facts and applicable law are relatively certain in favor of the
petitioner's asserted claims presented in this writ of Habeas Corp-
us seeking collateral/federal review by way of federal corrective
process.

The petitioner submits that he is entitled to relief sought
in this Writ of Habeas Corpus. Petitioner requests an evidentiary
hearing, so that he can assert his claims of entitlement to the re-
lief sought on grounds of [I]neffective assistance of counsel and
requests relief in vacating and setting aside the judgement, conv-
iction and sentence in this case.

The petitioner avers and asserts, based upon information and
belief that he has an absolute protected right to court access,
as a prisoner and Pro se litigant, under the constitutions and laws
of the United States and the State of Florida, and, that access
must be meaningful and effective, as expressed in the holdings
of the of the Supreme Court of the United States handed down in
Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491 (1977); moreover,
that legal pleadings of Pro se litigants are to be held to less
stringent standards than those perfected by attorneys trained in
law, Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594 (1972), and;

21

that the records will show s clear case of manifest injustice in denial of due process and equal protection, which should be taken under the protection umbrella of the trial court in this collateral appeal, much as in <u>Roberts v. Pepersack</u>, 256 F.Supp. 415 (D.C. Md. 1966), wherein it was mandated that the courts will assist prison inmates if it appears that State authorities may have deprived them of constitutional rights and they are unable to properly allege and assert them.

The sin que non of adversarial testing by defense counsel in undertaking to represent a client in a criminal prosecution may be found in the bedrock of the attorney-client relationship and the professional (ethical) responsibility and duty owed in his practice of law. That connection is premised upon the common sense "rule of thumb" injunction, implicit in modern basic principles of American law and jurisprudence (as reflected in ABA standards and Rules Regulating the Florida Bar, Chapter 4., Rules of professional Conduct, et seq.), <u>that in practice an attorney must confer with his client frequently to</u>:

    (1) become acquainted with his client;

    (2) exercise due diligence to ascertain and familiarize himself with the material and legally relevant facts and circumstances surrounding the alleged offense(s) from the clients point of view or perspective and through available information obtain from the charging authority;

    (3) investigate the legally relevant facts and circumstances involved in the case from it's inception;

    (4) apply the law to the facts and circumstances involved in the case from its inception;

    (5) advise his client of his rights and interests under the law;

    (6) discuss possible trial strategies, or in the event no viable defense exists at law and entering a negotiated plea is a tenable alternative, explore plea options in the best interests of his client;

22

(7) the criminal defendant, after being fully advised in the premises of any contemplated actions requiring an informed decision, and mental defect or disability that would impair an intelligent and informed decision not withstanding defense counsel is <u>duty</u> bound to move to vigorously assert and protect the rights and interests of his client to the limit and extent of the law, i.e. (a) file appropiate perfunctory motions for Bill of Particulars, Discovery, Bail, etc.; (b) interview and depose potential witnesses for both sides; (c) obtain professional witnesses when necessary in the interest of justice, etc. . . .

It should be apparent on the record and through the transcripts that counsel's performance fell measureably below an objective standard of reasonably competent and effective counsel, that the objectionable conduct of counsel prejudiced substantial rights and interests of the defendant, and that but for such conduct the end results in this case should have and would have been different.

In light of what has gone before in this case the petitioner would ask this honorable court to be mindful of the eminent jurisprudential thought on the subject of the necessity of having reasonably competent counsel for accused in criminal trial advocacy.

> "That government hires lawyers to prosecute
> and defendants who have money hire lawyers
> to defend are the strongest indications of the
> widespread belief that lawyers in criminal courts
> are necessities, not luxuries. The right of one
> charged with crime to counsel may not be deemed
> fundamental and essential to fair trials in some
> countries, but it is in ours. From the very
> beginning, our State and national constitutionss
> and laws have laid great emphasis on procedural
> and substantive safeguards designed to assure
> fair trials before impartial tribunals in which
> every defendant stands [e]qual before the law.
> <u>Gideon v. Wainwright</u>, 372 U.S. 335, 344, 83 S. Ct.
> 792, 796, 9 L.Ed.2d 799 (1963). (Emphasis
> supplied).

.  .  .

> **Time has not eroded the force of Justice**
> Sutherland's opinion for the Court in <u>Powell v.</u>
> <u>Alabama</u>, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158
> (1932):

23

"The right to be heard would be, in many cases, of
little avail if it did not comprehend the right to
be heard by counsel. Even the intelligent and educ-
ated layman has small and sometimes no skill in
the science of law. [I]f charged with crime, he is
incapable, geneally, of determining for himself
whether the indictment is good or bad. He is
unfamiliar with the rules of evidence. Left with-
out the aid of counsel he may be put on trial
[w]ithout a proper charge, and convicted upon
incompetent evidence or evidence irrelevant to
the issue or otherwise inadmissible. He lacks
both the skill and knowledge adequately to prepare
his defense, even though he may have a perfect one.
He requires the guiding hand of counsel at every step
in the proceedings against him. Without it though he
may be not guilty, he still faces the danger of con-
viction because he does not know how to establish
his innocence. If that be true of men of intelligence,
[h]ow much more true is it of the ignorant and illit-
erate, or those of feeble intellect. If in any case
civil or criminal, a state or federal court were
arbitrarily to refuse to hear a party of counsel,
employed by and appearing for him, it reasonably may
not be doubted that such a refusal would be a denial
of a hearing, and therefore, of due process in the
constitutional sense." Id., at 68-69, 53 S.Ct. at 63-64.

The court's opinion in United states v. Cronic, 104 S.Ct. 2039
(1984), illumined the issue of the importance of effective assis-
tance of counsel, drawing from prior opinions and holdings of the
court, in several important aspects, bearing on the facts in issue,
circumstances, and applicable law relied on by a defendant in ass-
erting his claims.

[2] The special value of the right to the assistance of counsel
explains why "[i]t has long been recognized that the right to cou-
nsel is the right to the effective assistance of counsel."
McMann v. Richardson, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 1449,
25 L.Ed.2d 763 (1970).

The text of the sixth amendment itself suggests as much. The
amendment requires not merely the provision of counsel to the acc-
used, but assistance, which is to be "for his defense". Thus, "the

24

core purpose of the counsel guarantee was to assure 'assistance'
at trial, when the accused was confronted with both the intrac-
acies of the law and th advocacy of the prosecutor." United States
v. Ash, 413 U.S. 300,309, 93 S.Ct. 2568, 2573, 37 L.Ed.2d 619
(1973). If no actual "assistance" "for" the accused's "defense" is
provided them the constitutional guarantee has been violated."11

> [11.  The Sixth Amendment however, guarantees
> more than appointment of competent counsel.
> By its terms, one has a right to 'assistance
> of counsel [for] his defense.' Assistance begins
> with the appointment of counsel, it does not end
> there. In some cases the performance of counsel
> may be so inadequate that, in effect, no assistance
> of counsel is provided. Clearly, in such cases,
> the defendant's Sixth Amendment right to 'have
> assistance of counsel' is denied."
> United States v. DeCoster, 624 F.2d **196, 219**
> (CADC) cert. denied, 444 U.S. 944, 100 S.Ct.
> 302, 62 L.Ed.2d 311 (1979) ].

To hold otherwise.

> 'could convert the appointment of counsel into
> nothing more than a formal compliance with the
> Constitution's requirement that an accused be
> given the assistance of counsel. The constit-
> ution's guarantee of assistance of counsel cannot
> be satisfied by mere formal appointment."
> Avery v. Alabama, 308 U.S. 444, 446, 60 S.Ct.
> 321, 322, 87 L.Ed. 377 (1940) (footnote omitted).

Thus, in McMann the court indicated that the accused is entit-
led to "a reasonably competent attorney," 397 U.S., at 770, 90 S.Ct.
at 1448, whose advise is "within the range of competence demanded
of attorneys in criminal cases." Id., at 771, 90 S.Ct., at 1449.12
(footnote omitted). In Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct.
1708, 64 L.Ed.2d 333 (1980), we held that the constitutional
guarantees an accused "adequate legal assistance." Id., at 344,
100 S.Ct., at 1716. And in Engle v. Isaac, 456 U.S. 107, 102
S.Ct. 1558, 71L.Ed.2d 783 (1982), the court feferred to the cri-
minal defendant's constitutional guarantee of "a fair trial and

a competent attorney." Id., at 134, 102 S.Ct., at 1575.

The substance of the constitution's guarantee of the effec-
tive assistance of counsel is illuminated by reference to its
underlying purpose. "Truth", Lord Eldon said, "is best discovered
by powerful statements on both sises of the question."13 (footnote
omitted). This dictum describes the unique strength of our system
of criminal justice; "the very premises of our adversary system
of criminal justice is that partisan advocacy on both sides of a
case will best promote the ultimate objective that the guilty be
convicted and the innocent go free." Herring v. New York, 422 U.S.
853, 862, 95 S.Ct. 2550, 45 L.ED.2d (1975).14 (footnote omitted)

It is that very premises that underlies and gives meaning to
the sixth amendment.15 (footnote omitted). It "is meant to assure
fairness in the adversary criminal process." United States v. Mor-
rison, 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1980).
Unless the accused receives the effective assistance of counsel,
"a serious risk of error infects the trial itself." Cuyler v.Sull-
ivan, 446 U.S., at 343, 100 S.Ct. at 1715.16 (footnote omitted).

.   .   .

"If the process loses its character as a confrontation between
adversaries, the constitutional guarantee is violated.20

> [20. The Court of Appeals focused on Counsel's
> overall representation of respondent, as opposed
> to any specific error or omission counsel may
> have made. Of course, the type of breakdown in
> the adversarial process that implicates the
> Sixth Amendment is not limited to counsel's
> performance as a whole- specific errors and
> omissions may be focus of a claim of ineff-
> ective assistance as well. See Strickland v.
> Washington, 466 U.S. 668, 104 S.Ct. 2052, 80
> L.Ed.2d 647 (1984) ].

26

As Judge Wyzanski has written: "while a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators. <u>United States ex rel. Williams v. Twomey</u>, 510 F.2d 634, 640 (CA7), cert.denied, 423 U.S. 876, 96 S.Ct. 148 46 L.Ed.2d 109 (1975).21 (footnote omitted).

In <u>Strickland v. Washington</u>, Supra, the United States Supreme Court held that a defendant's claim of ineffective assistance of counsel has two components:

> **First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id. at 687. 104 S.Ct. at 2064.**

A defendant must show that there is reasonable probability that the result of the proceeding would have been different if not for counsel's unprofessional errors. Id. 104 S.Ct. at 2068. Also see <u>Knight v. State</u>, 394 So.2d 997 (Fla.1981); <u>Jackson v. State</u>, 452 So.2d 533 (Fla.1984).

In order to win relief on a ground of ineffective assistance of counsel, a defendant must show "specific facts whic are not conclusively rebutted by the record and must demonstrate a deficiency in performance that prejudice the defendant." <u>Roberts v. State</u>, 568 So.2d 1255, 1259 (Fla.1990). Prejudice is demonstrated if the deficiency was sufficient to render the result unreliable. <u>Gorham v. State</u>, 521 So.2d 1067, 1069 (Fla. 1988) (citing <u>Strickland v. Washington</u>, 466 U.S. 668,687 (1984) ). Petitioner believes

27

through all of the grounds stated in this writ that he has demonstrated that his trial and appelate counsel rendered ineffective assistance of counsel and that their acts prejudice this petitioner. If it was not for the deficiency in the trial and appallate counsel's performance, then, petitioner believes the outcome of his trial and/or direct appeal would have resulted in a different outcome, a much more positive outcome that would have been favorable to the petitioner.

## CONCLUSION

Finally, in conclusion, petitioner believes that he has shown this honorable court that the outcome of this case would have been different if his trial attorney had properly prepared for trial and/ or his appellate counsel had properly raised and argued all possible issues. Petitioner prays that this honorable court will grant him an evidentiary hearing, so that he may be able to fully show in person how he was prejudiced by both counsel's acts.

## RELIEF SOUGHT

WHEREFORE, the petitioner prays that this honorable court vac- ate and set aside the Judgement, Conviction and sentence in this cause/case and/or grant a new trial, or in the alternative grant such other and further relief as this honorable court in its wis- dom deems just and appropiate and equitable.

Respectfully Submitted,

DARRYL HARDEN, #673792
Hendry Correctional Institution
Route 2 Box 13-A/M.B.#1091
Immokalee, Florida 33934

29